UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MYRNA ADAME, et al.,<br><br>         Plaintiffs,<br><br>v.<br><br>NATIONAL STEEL AND SHIPBUILDING COMPANY, INC., et al.,<br>         Defendants. | Lead Case No.: 24-cv-00297-AJB-VET<br>Consolidated with:<br>Case No. 24-cv-00306-AJB-VET<br>Case No. 24-cv-00346-AJB-VET<br>Case No. 24-cv-00350-AJB-VET<br><br>**ORDER DENYING PLAINTIFFS' MOTION TO REMAND**<br>**(Doc. No. 12)** |

  Presently pending before the Court is Plaintiffs' motion to remand. (Doc. No. 12.) Defendants National Steel and Shipbuilding Company, General Dynamics Corporation, Inc., General Dynamics NASSCO, and General Dynamics NASSCO Holding, LLC (collectively, "NASSCO") and United Support Systems ("USSI") (collectively, "Defendants") filed an opposition (Doc. No. 15), to which Plaintiffs replied (Doc. No. 16). For the reasons set forth herein, the Court **DENIES** Plaintiffs' motion to remand.

## I. BACKGROUND

  Plaintiffs' complaint arises from injuries caused by toxic smoke that emanated from a July 2020 fire on the United States Navy's amphibious assault ship, the USS Bonhomme

Richard ("BHR"). (Complaint ("Compl."), Doc. No. 1-4, ¶¶ 1–2, 25–26.)[1] The fire began on July 12, 2020, and continued until July 16, 2020. (*Id.* ¶ 15.) From the cargo area where the fire originated, flames spread quickly throughout the ship, raising temperatures to about 1,200 degrees and resulting in a series of explosions. (*Id.* ¶¶ 16, 18.) At the time of the fire, the ship was undergoing maintenance pier-side adjacent to Naval Base San Diego (the "Naval Base") in San Diego, California. (*Id.* ¶ 15.) Both NASSCO and USSI were under contract with the Navy to service BHR at the time of the fire. (Doc. No. 15 at 8.)[2] NASSCO provided general contractor services for the repair of BHR, while USSI was hired to provide the duties of the Contract Fire Service Officer ("CFSO"). (Doc. No. 12-1 at 9.)

In the aftermath, the Navy investigated the fire aboard BHR and concluded that, while the cause of the fire was arson, the "magnitude and severity of the fire" was caused by "the handling and storage of materials coupled with the lack of coordination on the weekend of the fire, combined with a lack of mitigation or consideration for risk accumulation[.]" (U.S. NAVY, COMMAND INVESTIGATION INTO THE FIRE ABOARD USS BONHOMME RICHARD (LHD-6) 12 JULY 2020, 5830 MEMO N00/156 (Apr. 5, 2021), Doc. No. 12-5, at 11, 259.)

Plaintiffs, who are homeowners, renters, business owners, and other individuals in the San Diego area, allege their health and property were severely harmed by the BHR fire. (Compl. ¶ 2.) The San Diego County Air Pollution Control District found over a dozen harmful toxic substances in the air. (*Id.* ¶ 26.) Plaintiffs inhaled these substances over several days, causing severe eye, nose, throat, and lung damage, other upper respiratory conditions, and neurological symptoms, including but not limited to headaches, dizziness, fatigue, anxiety, confusion, stress, nausea, and vomiting. (*Id.*) Plaintiffs allege Defendants'

---

[1] This case results from the consolidation of four actions filed against Defendants: (1) the instant lead case *Adame et al. v. Nat'l Steel and Shipbuilding Co. et al.*, 23-cv-00297-AJB-VET; (2) *Garland et al. v. Nat'l Steel and Shipbuilding Co. et al.*, 24-cv-00306-AJB-VET; (3) *Adame et al. v. Nat'l Steel and Shipbuilding Co. et al.*, 24-cv-00346-AJB-VET; and (4) *Garland et al. v. Barrera et al.*, 24-cv-00350-AJB-VET. All references to filings are to those in the lead case.

[2] Citations to the record refer to the electronic pagination of the CM/ECF system at the top of each page rather than the page numbers at the bottom of each filing.

negligent acts and omissions caused the fire and directly contributed to its uncontrolled spread across the ship. (*Id.* ¶ 15.)

Each of the consolidated actions were originally filed in state court but removed to this Court. On March 25, 2024, Plaintiffs filed the instant motion to remand. (Doc. No. 12.)

## II.   LEGAL STANDARD

As courts of limited jurisdiction, federal courts may hear only those cases for which subject matter jurisdiction has been conferred either by Congress or by the Constitution. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Generally, removal of a civil action to federal court is proper only if the district court would have original jurisdiction over the matter at the time of removal. 28 U.S.C. § 1441(a). District courts must construe the removal statutes strictly against removal and resolve any uncertainty as to removability in favor of remanding the case to state court. *Boggs v. Lewis*, 863 F.2d 662, 663 (9th Cir. 1988). The burden is on the removing party to demonstrate federal subject matter jurisdiction over the case. *See Emrich v. Touche Ross & Co.*, 846 F.2d 1190, 1195 (9th Cir. 1988).

## III.   DISCUSSION

Defendants removed the state civil action to this Court raising several bases for removal: (1) federal enclave jurisdiction, 28 U.S.C. § 1441(a); (2) the Federal Officer Removal Statute, 28 U.S.C. § 1442; and (3) maritime jurisdiction, 28 U.S.C. § 1441(a). (Notice of Removal ("NOR"), Doc. No. 1, ¶ 13.) Plaintiffs challenge each of these theories of removal and move to remand. (Doc. No. 12.)

### A.   Federal Enclave Jurisdiction

#### 1.   Parties' Arguments

As an initial matter, the parties agree that Naval Base San Diego is a federal enclave. (*See* Doc. Nos. 12-1 at 15; 15 at 10.) The Court concurs. *See Carvajal v. Pride Indus., Inc.*, No. 10-CV-002319-GPC-MDD, 2013 WL 1728273, at *5 (S.D. Cal. Apr. 22, 2013) ("The Naval Base San Diego, formerly known as The Destroyer Base, became a federal enclave on February 23, 1922 pursuant to General Order No. 78 of the Navy Department and the

State of California authorized the transfer of land."). However, at issue here is whether BHR constituted a federal enclave while docked at Pier 2 of the Naval Base during the events in question.

Plaintiffs assert federal enclave jurisdiction does not apply because their claims do not "arise" within a federal enclave. (Doc. No. 12-1 at 14–17.) First, as BHR was docked in navigable waters within three miles of the coast, Plaintiffs assert there is joint state and federal jurisdiction, thus precluding federal enclave jurisdiction. (*Id.* at 15–16.) Second, Plaintiffs argue their claims arise where the injury occurred—"within their San Diego residential neighborhoods"—not where Defendants' actions occurred. (*Id.* at 16–17.)

In opposition, Defendants respond that removal is proper based on federal enclave jurisdiction because Plaintiffs' claims stem from conduct alleged to have taken place within a federal enclave, regardless of where the alleged injury occurred. (Doc. No. 15 at 10–12, 15–16.) Specifically, Defendants assert that BHR was docked within the boundaries of the Naval Base, thus making the ship itself a federal enclave. (*Id.* at 12–15.) To support this contention, Defendants provide a photograph depicting BHR docked at Pier 2 of the Naval Base and a map demonstrating that "326 acres of water," including those waters surrounding Pier 2, are within the boundaries of the Naval Base. (*Id.* at 12–13; *see also* Exhibit A–B of this Order.)

2. Legal Standard

"Federal courts have federal question jurisdiction over tort claims that arise on 'federal enclaves.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1250 (9th Cir. 2006); *see also* 28 U.S.C. § 1331. The federal enclave doctrine draws its authority from Article I, Section 8, Clause 17 of the U.S. Constitution:

> Congress shall have power . . . [t]o exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings.

U.S. Const. art. I § 8, cl. 17. "As this clause has been interpreted, when the federal government purchases state land with the consent of the state legislature, any law existing on that land must derive its authority and force from the United States and is for that reason federal law." *Cnty. of San Mateo v. Chevron Corp.* ("*San Mateo III*"), 32 F.4th 733, 749 (9th Cir. 2022) (internal punctuation and citation omitted); *see also Willis v. Craig*, 555 F.2d 724, 725 n.3 (9th Cir. 1977) (quoting *Surplus Trading Co. v. Cook*, 281 U.S. 647 (1930)) ("'Exclusive legislation' in clause 17 has been construed to mean exclusive 'jurisdiction' in the sense of exclusive sovereignty.").

The Ninth Circuit has noted that the doctrine of federal enclave jurisdiction is applied narrowly. *City & Cnty. of Honolulu v. Sunoco LP* ("*Honolulu II*"), 39 F.4th 1101, 1111 (9th Cir. 2022). "A claim must allege that an injury occurred on a federal enclave or that an injury stemmed from conduct on a federal enclave." *Id.* (citing *San Mateo III*, 32 F.4th at 749–50). "And the connection between injuries and conduct must not be too attenuated and remote. For example, a defendant cannot use activities on federal enclaves to create instant jurisdiction for a state-law claim." *Id.* (citation omitted).

      3. *Location of Injury and of Conduct from Which Injury Stemmed*

As an initial matter, Plaintiffs argue that their injuries could not have "arisen from" a federal enclave because, pursuant to California substantive law, a cause of action only accrues once all the elements of the tort were complete—including the injuries which occurred in the residential neighborhoods. (Doc. Nos. 12-1 at 16–17; 16 at 11–13.) Plaintiffs' initial argument on this issue is devoid of case law. (*See generally* Doc. No. 12-1.) In their reply, Plaintiffs assert that "[c]ourts in this district and many others have held that tort claims 'arise' within the federal enclave for jurisdictional purposes once the underlying tort is complete as a matter of substantive law." (Doc. No. 16 at 11–12.) However, the cases cited by Plaintiffs are outdated, are inapposite either to the proposition presented for or to the circumstances of the instant case, or are out-of-circuit.

///

///

More apropos, in 2022, the Ninth Circuit issued two opinions setting forth the framework for federal enclave jurisdiction. *See San Mateo III*, 32 F.4th at 749–50; *Honolulu II*, 39 F.4th at 1111. In *San Mateo III*, after surveying the sparse case law on the issue, the Ninth Circuit analyzed whether the plaintiffs' "tort claims arose from actions and injuries that occurred on federal enclaves and thus were governed by federal law." 32 F.4th at 749–50. In *Honolulu II*, the Ninth Circuit clearly set forth the rule that "[a] claim must allege that an injury occurred on a federal enclave *or* that an injury stemmed from conduct on a federal enclave." 39 F.4th at 1111 (emphasis added).³

Here, the injuries alleged by Plaintiffs clearly stemmed from conduct on BHR. Plaintiffs' complaint includes myriad allegations of negligent conduct *on* BHR, including failing to clear and properly store scaffolding, cables, equipment and debris. (*See, e.g.*, Compl. ¶ 17 ("A reasonable person in Defendants' position would store away such clutter to prevent fire hazards, but Defendants failed to implement the most basic fire safety practice."); ¶ 18 ("Defendants had carelessly placed large and heavy electric and other cables in a manner that prevented sailors from closing doors and other hatches to prevent the further spread of the fire. Misplaced scaffolding, equipment, and debris also came in the way of firefighters, thereby compounding the already difficult task of fighting flames."); ¶ 19 ("Considering the maintenance work that was being done, and the hazardous conditions on the ship, a reasonable person would have maintained close watch on the area, but Defendants failed to maintain the requisite level of competent watch crews to look after the vessel."); ¶ 22 ("Nonetheless, fire safety procedures were not followed by Defendants **on the USS Bonhomme Richard** and their negligence caused (and helped spread) the fire that burned for nearly five days and emitted toxic fumes that enveloped

---

³ Because the Ninth Circuit has clearly defined what it means for a tort claim to "arise on" a federal enclave, the survey of case law and conclusions of the out-of-circuit case relied on by Plaintiffs is unavailing. *Cf. Amtec Corp. v. U.S. Centrifuge Sys., L.L.C.*, No. CV-12-RRA-1874-NE, 2012 WL 12897212, at *8 (N.D. Ala. Dec. 6, 2012), *report and recommendation not adopted but objections overruled sub nom. Amtec Corp. v. US Centrifuge Sys. LLC*, No. 5:12-CV-1874-RRA, 2013 WL 12147712 (N.D. Ala. May 29, 2013) ("Neither party cites and this court has not found a case issued by the Eleventh Circuit which sets out the standard, in a federal enclave analysis, for determining where a claim 'arose.'").

several San Diego residential neighborhoods and endangered the life, health, and safety of innocent residents who were miles away from the ship.") (emphasis added).) As such, Plaintiffs' complaint expressly identifies their injuries as stemming from Defendants' conduct on BHR.

In their reply, Plaintiffs rely on cases following the proposition that federal enclave jurisdiction applies to injuries that occur on a federal enclave. *See, e.g.*, *In re High-Tech Employee Antitrust Litigation*, 856 F. Supp. 2d 1103, 1125 (N.D. Cal. 2012) ("The Ninth Circuit has held that in federal enclave cases, 'the jurisdiction of the federal court depends upon . . . the locus in which the claim arose.'"); *Anderson v. Crown Cork & Seal*, 93 F. Supp. 2d 697, 700 (E.D. Va. 2000) ("First, the Court must determine whether a vessel standing alone can be a federal enclave. Second, the Court must determine whether federal enclave jurisdiction is established in a case where a person's alleged injuries occur on a vessel that was at some points located in a facility considered a federal enclave, and at other times was not."); *Roll v. Tracor, Inc.*, 140 F. Supp. 2d 1073, 1078 n.2, 1082 (D. Nev. 2001) (noting on summary judgment in a products liability case that the plaintiff's choice-of-law argument failed because the injury did not occur under the exclusive jurisdiction of the United States). Although Plaintiffs' injuries occurred in residential neighborhoods outside the Naval Base, such case law is not persuasive because Ninth Circuit law does not require both the injury and the injurious conduct to occur on a federal enclave. Here, it is the status of the conduct's location, not that of the injury, the parties contest.

Plaintiffs also cite numerous cases where courts did not have sufficient facts to determine whether the injury occurred on a federal enclave. *See, e.g.*, *Zuniga v. Chugach Maint. Servs.*, No. CVF060048AWILJO, 2006 WL 769317, at *6–*8 (E.D. Cal. Mar. 24, 2006) (finding insufficient facts to determine the application of the federal enclave doctrine where the complaint did not allege *any facts* as to where the incidents at issue took place); *Akin v. Ashland Chem. Co.*, 156 F.3d 1030, 1035 (10th Cir. 1998) (affirming the district court's determination that the term "while working at" a military base "could serve as either a 'geographical modifier' or a 'durational modifier'" so removal timely occurred upon

discovery resolving the ambiguity). However, these are not the circumstances at issue in the instant case as the parties have proffered sufficient evidence for the Court to make a determination.

Finally, Plaintiffs reference cases where courts found that the injury was too attenuated or remote from conduct on a federal enclave for jurisdiction to apply. *See, e.g.*, *Honolulu II*, 39 F.4th at 1112 ("Even if much of Defendants' oil and gas operations occurred on federal enclaves, that still does not transform Plaintiffs' claims about deceptive practices into claims about the conduct itself."); *San Mateo III*, 32 F.4th at 750 ("[T]he Energy Companies allege only that some of the defendants engaged in some conduct on federal enclaves that may have contributed to global warming, which allegedly caused the rising sea levels that resulted in the injuries that are the basis for the Counties' claims."). Here, in contrast, Plaintiffs allege that Defendants' conduct on BHR caused the magnitude and duration of the fire, the smoke from which injured Plaintiffs. (*See, e.g.*, Compl. ¶ 31 ("Here, Plaintiffs had to live in toxic chemical smoke for nearly a week solely due to the negligent acts of Defendants.")).

Thus, having found that Plaintiffs' injuries stem from conduct on BHR, if the Court finds that BHR qualifies as a federal enclave, then federal enclave jurisdiction applies. *See infra* §§ III.A.4–5. Accordingly, the Court turns to that issue next.

4. *Status of the Waters in Which BHR Was Docked*

The primary theory upon which Defendants' federal enclave argument rests is that the waters in which BHR was floating while docked are a federal enclave as they are within the boundaries of the Naval Base. (*See* NOR ¶ 18; Doc. No. 15 at 12–13.)

Plaintiffs' focus on labeling BHR's pier-side mooring as in "navigable waters" appears to implicitly argue that water cannot both be navigable and a federal enclave. (Doc. Nos. 12-1 at 15 ("Defendants have not identified any binding or persuasive authority supporting an argument that coastal land is automatically subject to the exclusive jurisdiction of the federal government."); 16 at 8 ("At the time of the fire, the ship was docked in navigable waters for repairs. Thus, the ship was within three miles of the coast,

and therefore was not under exclusive federal jurisdiction."), 9–10 ("Defendants' Opposition now attempts to provide evidence by introducing two images to show the ship was docked within the boundaries of the Naval Base. However, water is not part of a federal enclave merely because it is adjacent to or near the enclave or flows into or out of it.").) In their reply, Plaintiffs even go as far as to assert that water never qualifies as a federal enclave. (Doc. No. 16 at 9 ("A federal enclave is a ***portion of land*** over which the federal government exercises *exclusive* legislative jurisdiction.") (emphasis in original).)

However, Plaintiffs do not proffer, nor is the Court aware of, any binding or persuasive authority supporting either assertion. Plaintiffs first rely on *Childs v. San Diego Family Housing LLC*, a case in which the United States, a non-party, challenged the court's subject matter jurisdiction by asserting the property at issue, which was located within the boundaries of Naval Amphibious Base Coronado, was not a federal enclave. 714 F. Supp. 3d 1262, 1268 (S.D. Cal. 2024), *appeal filed* No. 24-1256 (9th Cir. May 4, 2024). There, the defendants argued that, "because the United States exercises jurisdiction over the navigable waters of the United States" pursuant to the Submerged Lands Act, any "land created by dredging and filling navigable coastal waters are automatically under the federal government's exclusive jurisdiction." *Id.* at 1272. The court rejected the theory because the Ninth Circuit "had found previously there was congressional intent for there to be 'joint federal/state regulation of ocean waters within three miles of shore.'" *Id.* at 1272–73 (quoting *Beveridge*, 939 F.2d at 864). However, unlike in *Childs*, Defendants here do not rely on general theories of federal jurisdiction pursuant to the Submerged Lands Act.[4] (*See generally* Doc. No. 15 at 10–15.)

///
///
///

---

[4] Considering Defendants do not rely on such theories, Plaintiffs' argument that "Defendants have not identified any binding or persuasive authority supporting an argument that coastal land is automatically subject to the exclusive jurisdiction of the federal government," (Doc. No. 12-1 at 16), is inapposite and need not be further addressed.

Plaintiffs' argument in favor of remand relies heavily on the Ninth Circuit's assessment of congressional intent, which Plaintiffs and the *Childs* court attribute to *Beveridge*. In *Beveridge*, the Ninth Circuit analyzed whether federal law regulating navigation, waterways, and harbors preempted a Santa Barbara city ordinance regarding mooring of boats. *Beveridge*, 939 F.2d at 861. In conducting its preemption analysis, the Ninth Circuit determined that, despite its comprehensiveness, the Ports and Waterways Safety Act did not rise to the level of implicit preemption in part because there is congressional intent for joint regulation within three miles of shore, such as for regulating pollution. *Id.* at 861, 864. Federal enclave doctrine was neither addressed nor relevant to the Ninth Circuit's decision in *Beveridge*.

Distinct from *Beveridge*, the waters at issue here are within the bounds of a military installation, as evidenced by the map proffered by Defendants. (*See* Doc. No. 15 at 12–15; Ex. B.) The nautical boundaries of the Naval Base are physically marked in the water beyond BHR. (Ex. A.) Moreover, per federal regulation, the waters within the boundary line marked by the map are a restricted "security zone," providing further evidence that the waters are a part of the Naval Base and thus a federal enclave. *See* 33 C.F.R. § 165.1101(b)(1) ("In accordance with the general regulations in § 165.33 of this part, entry into the area of this zone is prohibited unless authorized by the Captain of the Port San Diego; Commander, Naval Base San Diego; Commander, Navy Region Southwest; or the Commanding Officer, Naval Station, San Diego.").[5]

///
///
////
///

---

[5] "[T]his zone" is defined as "the water area within Naval Station, San Diego enclosed by the following points: Beginning at 32°41′16.5″ N, 117°08′01″ W (Point A); thence running southwesterly to 32°40′58.3″ N, 117°08′11.0″ W (Point B); to 32°40′36.0″ N 117°07′49.1″ W (Point C); to 32°40′17.0′ N, 117°07′34.6″ W (Point D); to 32°39′36.4″ N, 117°07′24.8″ W (Point E); to 32°39′38.5″ N 117°07′06.5″ W, (Point F); thence running generally northwesterly along the shoreline of the Naval Station to the place of the beginning." 33 C.F.R. § 165.1101(a).

Plaintiffs fail to challenge Defendants' map or otherwise substantively address Defendants' evidence, arguing instead that "water is not part of a federal enclave merely because it is adjacent to or near the enclave or flows into or out of it" (*see generally* Doc. No. 16); however, this argument is foreclosed by the evidence.

Having found that Plaintiffs' claims arise from conduct aboard BHR, *see supra* § III.A.3, and because BHR was docked within a federal enclave at the time of the incident at issue, federal enclave jurisdiction applies.

### 4. Status of BHR as Derived from Docking at Pier 2

Secondarily, Defendants argue that federal enclave status extends to BHR by virtue of docking at the federal dockyard. (Doc. No. 15 at 14–15.) In support of this contention, Defendants cite to three cases where courts have held that the federal enclave doctrine applies to conduct aboard ships docked at federal dockyards. (*Id.* (relying on *Scott v. Does 1 through 100*, No. 12-cv-06235, 2012 WL 13013026, at *1, *9–10 (C.D. Cal. Oct. 15, 2012); *Carvajal*, 2013 WL 1728273, at *3, *5; and *Fung v. Abex Corp.*, 816 F. Supp. 569, 571 (N.D. Cal. 1992)).)

The Court is not persuaded by cases where federal enclave jurisdiction was presumed or otherwise not in dispute. *See, e.g.*, *Carvajal*, 2013 WL 1728273, at *4–*6 (preliminarily noting the plaintiff "d[id] not dispute that the relevant events occurred on a federal enclave" when analyzing whether state law claims were barred by the federal enclave doctrine on summary judgment); *Fung*, 816 F. Supp. 569 at 571 (analogizing to a case where the parties conceded federal enclave jurisdiction existed and finding, without analysis, the same to be true).

Although *Scott* preceded the recent Ninth Circuit opinions on federal enclave jurisdiction by a decade, it is informative as it thoroughly analyzes "whether federal enclave jurisdiction applies . . . to naval ships that are docked in the water of a naval shipyard." *Scott*, 2012 WL 13013026, at *2. Both plaintiffs—Scott and Boyd—developed numerous health issues after long-term exposure to products containing asbestos through the course of their work. *Id.* at *1. Scott, who worked for Long Beach Naval Shipyard, was

exposed entirely while on naval vessels that were docked at the naval shipyard; Boyd was a boatsman mate whose exposure occurred exclusively aboard two vessels while docked at various shipyards and while at sea. *Id.* at *1, *5–*6. In the absence of relevant Ninth Circuit authority on federal enclave jurisdiction, the court analogized to the land-sea jurisdictional boundaries drawn in admiralty law and surveyed district court cases across the circuits to determine that federal enclave jurisdiction applied to Scott's claims but not to Boyd's. *Id.* at *3–*9.

Instead of countering Defendants' reliance on *Scott* for the proposition that naval ships docked at naval dockyards are federal enclaves, Plaintiffs assert that their experiences are more akin to Boyd's than to Scott's as their injury occurred in the residential neighborhoods. (Doc. No. 16 at 11.) However, the Court has already disposed of Plaintiffs' exclusive location-of-injury argument as contrary to recent Ninth Circuit law. *See supra* § III.A.3.

It is clear to the Court that federal enclave doctrine extends from federal dockyards to a naval vessel attached thereto if the claims arose (1) on the vessel and (2) while the vessel was docked. Because both are true in the instant action, federal enclave jurisdiction is proper, regardless of the status of the waters in which BHR was docked.

### 5. Conclusion

Having found that the injuries alleged by Plaintiffs stem from conduct on BHR and that BHR at the time of the conduct at issue was a federal enclave (1) due to its location within the boundaries of the Naval Base and independently (2) due to connection to the federal dockyard, federal jurisdiction is proper pursuant to the federal enclave doctrine. Accordingly, the Court **DENIES** Plaintiffs' motion to remand.

### B. Remaining Grounds for Removal

As the Court has determined subject matter jurisdiction exists under the federal enclave doctrine, the Court declines to address the other grounds for removal that Plaintiffs contest.

///

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiffs' motion to remand (Doc. No. 12). No later than **March 14, 2025**, Defendants are to file a response to the complaint.

**IT IS SO ORDERED**.

Dated: February 27, 2025

Hon. Anthony J. Battaglia
United States District Judge

**Exhibit A**



U.S. Navy, Command Investigation into the Fire Aboard USS Bonhomme Richard (LHD-6) 12 July 2020, 5830 Memo N00/156 (Apr. 5, 2021), Doc. No. 12-5, at 35 fig.5.

**Exhibit B**

*U.S. Navy's Comments and Evidentiary Submission: Tentative Cleanup and Abatement Order No. R9-2011-0001*, OFFICE OF THE GENERAL COUNSEL, U.S. NAVY, at 14 (May 26, 2011), https://www.waterboards.ca.gov/rwqcb9/water_issues/programs/shipyards_sediment/docs/sediment_cleanup/adt/updates060211/navy.pdf [https://perma.cc/45MD-B83X].