

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

MYRNA ADAME, et al.,

Plaintiffs,

v.

NATIONAL STEEL AND SHIPBUILDING COMPANY, INC., et al.,

Defendants.

Lead Case No.: 24-cv-00297-AJB-VET
Consolidated with:
Case No. 24-cv-00306-AJB-VET
Case No. 24-cv-00346-AJB-VET
Case No. 24-cv-00350-AJB-VET

**ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS**
**(Doc. Nos. 31; 32)**

Before the Court is a motion to dismiss filed by Defendants National Steel and Shipbuilding Company ("NASSCO"), General Dynamics Corporation, Inc. ("GDC") (Doc. No. 31), which United Support Services, Inc. ("USSI") joined (Doc. No. 32). Plaintiffs filed an opposition to NASSCO and GDC's motion (Doc. No. 34) and to USSI's motion (Doc. No. 35), to which all parties respectively replied (*see* Doc. Nos. 36 (NASSCO/GDC reply); 37 (USSI reply).) For the reasons set forth herein, the Court **DENIES without prejudice** Defendants' Rule 12(b)(1) motion, **GRANTS** NASSCO and GDC's Rule 12(b)(6) motion, **GRANTS in part** and **DENIES in part** USSI's Rule 12(b)(6) motion.

1

## I.   BACKGROUND

Plaintiffs' complaint arises from injuries caused by toxic smoke that emanated from a July 2020 fire (the "Incident") on the United States Navy's amphibious assault ship, the USS Bonhomme Richard ("BHR"). (First Amended Complaint ("FAC"), Doc. No. 27, ¶¶ 1–4; *see also id.* ¶¶ 35–41 (detailing the extent of Plaintiffs' alleged injuries).)[1] The federal government contracted with Defendants in 2018 to service the BHR. (*Id.* ¶ 20.) NASSCO, a subsidiary of GDC, was charged with maintenance and repairs, which it was conducting while the BHR was pier side at the Naval Base San Diego (the "Naval Base") at the time of the Incident. (*Id.* ¶¶ 20–23.) According to the FAC, NASSCO, acting as an independent contractor, "maintained control and custody" of "portions" of the BHR while performing repairs but "deviat[ed from] the requirements of both reasonable acceptable standards in the industry and the terms of its contract in storing and maintaining its supplies on board," which "caused the fire and directly contributed to its uncontrolled spread across the ship." (*Id.* ¶¶ 22–23, 25.) Plaintiffs also allege USSI "was an independent contractor hired by the United States to provide fire safety services," but USSI "did not have the proper certifications to provide these services," "failed to adequalty [sic] warn the military personnel on the USS Bonhomme Richard about potential fire hazards," and failed to "notify any other Defendants that they were out of compliance with reasonable fire safety protocols." (*Id.* ¶ 26.)

"The US Navy concluded in its own investigation that the five-day fire and destruction of the ship was preventable if ship building and maintenance personnel and contractors avoided clutter, followed fire safety measures, enabled unrestricted access to firefighting and damage control equipment, and enforced fire safety training." (*Id.* ¶ 27.) Plaintiffs allege Defendants' negligent acts and omissions caused the fire and directly

---

[1]   This case results from the consolidation of four actions filed against Defendants: (1) the instant lead case *Adame et al. v. Nat'l Steel and Shipbuilding Co. et al.*, 23-cv-00297-AJB-VET; (2) *Garland et al. v. Nat'l Steel and Shipbuilding Co. et al.*, 24-cv-00306-AJB-VET; (3) *Adame et al. v. Nat'l Steel and Shipbuilding Co. et al.*, 24-cv-00346-AJB-VET; and (4) *Garland et al. v. Barrera et al.*, 24-cv-00350-AJB-VET. All references to filings are to those in the lead case.

24-cv-00297-AJB-VET

contributed to its uncontrolled spread across the ship. (*Id.* ¶ 23.) After the Court denied Plaintiffs' motion to remand (Doc. No. 19), Defendants filed motions to dismiss (*see* Doc. Nos. 20; 23). In response, Plaintiffs filed the FAC, Defendants' challenges to which the Court addresses herein.

## II.   MOTIONS TO DISMISS PURSUANT TO RULE 12(b)(1)

### A.   Legal Standard

"Federal courts are courts of limited jurisdiction[,] . . . possess[ing] only that power authorized by Constitution and statute, which is not to be expanded by judicial decree." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Rule 12(b)(1) of the Federal Rules of Civil Procedure permits a party to file a motion to dismiss for "lack of subject matter jurisdiction." Fed. R. Civ. P. 12(b)(1). "Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence." *Robinson v. United States*, 586 F.3d 683, 685 (9th Cir. 2009).

"A Rule 12(b)(1) jurisdictional attack may be facial or factual." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they 'are insufficient on their face to invoke federal jurisdiction.'" *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (quoting *Safe Air for Everyone,* 373 F.3d at 1039). "A 'factual' attack, by contrast, contests the truth of the plaintiff's factual allegations, usually by introducing evidence outside the pleadings." *Id.* (citation omitted).

"In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment." *Safe Air for Everyone*, 373 F.3d at 1039. "Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036, 1040 (9th Cir. 2003).

24-cv-00297-AJB-VET

"If the 'existence of jurisdiction turns on disputed factual issues,' and those 'jurisdictional disputes are not intertwined with the merits of the claim,' then 'it falls to the district court to resolve those factual disputes itself.'" *Bowen v. Energizer Holdings, Inc.*, 118 F.4th 1134, 1143 (9th Cir. 2024) (quoting *Friends of the Earth v. Sanderson Farms, Inc.*, 992 F.3d 939, 944 (9th Cir. 2021)). However, "a court must leave the resolution of material factual disputes to the trier of fact when the issue of subject-matter jurisdiction is intertwined with an element of the merits of the plaintiff's claim." *Leite*, 749 F.3d at 1122 n.3. "'[J]urisdictional issues and substantive issues' are deemed 'intertwined when the question of jurisdiction is dependent on the resolution of factual issues going to the merits.'" *Bowen*, 118 F.4th at 1143 (quoting *Safe Air for Everyone*, 373 F.3d at 1039).

**B.      Discussion**

Defendants move to dismiss the entire action on the grounds that the Court lacks subject matter jurisdiction. Specifically, Defendants assert that the Court would have federal admiralty jurisdiction but, because Defendants were acting as agents of the United States, the Suits in Admiralty Act ("SIAA") applies, making suit against the United States the exclusive remedy. (*See generally* Doc. Nos. 31-1; 32.) Plaintiffs oppose the motions on the basis that Defendants were independent contractors—not agents—and resolution of this issue is improper at this stage of the proceedings. (*See generally* Doc. Nos. 34; 35.)

**1.      Applicable Rule 12(b)(1) Framework**

First, the parties disagree over whether Defendants' motions are facial or factual attacks. Plaintiffs argue that "Defendants' motion to dismiss should be considered a facial attack on Plaintiffs' FAC" because (1) Defendants attach documents which "create a factual dispute requiring denial of the motion" and (2) Defendants filed their motion "before any discovery has been conducted in this matter." (Doc. No. 34 at 10.) "Given these facts," Plaintiffs assert without support of case law that "the Court may treat Defendants' motion as a facial challenge and deny the motion because . . . Plaintiffs' allegations in the FAC are assumed to be true." (*Id.*)

///

24-cv-00297-AJB-VET

In reply, NASSCO and GDC assert their jurisdictional challenge is factual, not facial, because they "'present[] affidavits or other evidence' in support of [their] motion, including NASSCO's contract with the Navy, the Navy's Command Report, and a declaration from a NASSCO employee speaking to the Navy's pervasive control over all aspects of NASSCO's work on the BHR." (Doc. No. 36 at 3 (quoting *Savage*, 343 F.3d at 1039).)

The crux of Defendants' challenge is that they were acting as agents of the United States—not independent contractors—at the time of the Incident and, as such, they are immune from suit under the exclusivity clause of SIAA. (*See generally* Doc. Nos. 31; 32; 36; 37.) Throughout their papers, the parties mostly proffer different facts from which they make conflicting legal conclusions regarding agency, and Plaintiffs also contest the truth of portions of Defendants' declarations. (*See, e.g.*, Doc. Nos. 34 at 6; 35 at 6–7.) Because Defendants rely on additional facts as further context—including facts from the affidavits and other evidence outside the pleadings—the challenge is factual rather than facial. *See Leite*, 749 F.3d at 1121. As such, "[n]o presumptive truthfulness attaches to [P]laintiff[s'] allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims."[2] *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 65 F.4th 1012, 1028 (9th Cir. 2023) (quoting *Thornhill Pub. Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979)).

Second, the parties' arguments raise the issue of who bears the burden. Defendants assert "it is *Plaintiffs'* burden to prove that jurisdiction exists[.]" (*See* Doc. Nos. 31-1 at 13 (citing *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) (addressing standing where a class action was originally filed in federal court); 36 at 3

---

[2] Plaintiffs also assert that "the court must construe all factual disputes in favor of the non-moving party." (Doc. No. 34 at 8.) However, all the cases upon which Plaintiffs rely address *appellate standard of review* of a district court's determination of whether the *Feres* doctrine applies to the specific facts of a Federal Tort Claims Act suit. *See McConnell v. United States*, 478 F.3d 1092 (9th Cir. 2007); *Costo v. United States*, 248 F.3d 863 (9th Cir. 2001); *Dreier v. United States*, 106 F.3d 844 (9th Cir. 1996), *as amended* (Feb. 4, 1997).

24-cv-00297-AJB-VET

(quoting Wright & Miller, § 1350, 5B Fed. Prac. & Proc. Civ. § 1350 (4th ed.) and *Savage v. Glendale Union High Sch., Dist. No. 205, Maricopa Cnty.*, 343 F.3d 1036 (9th Cir. 2003)).) Defendants rely exclusively on cases addressing jurisdictional motions to dismiss complaints filed originally in federal court, none of which address the applicability of the SIAA, let alone its exclusivity provision. The complex procedural posture of the instant action is inapposite.

Because "[i]t is presumed that a cause lies outside this [Court's] limited jurisdiction, . . . the burden of establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citations omitted). When an action has been removed to federal court by Defendants, as this action has, "[t]he remover bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met." *DeFiore v. SOC LLC*, 85 F.4th 546, 553 (9th Cir. 2023). However, here, Defendants are also the movants challenging jurisdiction, which on superficial glance would place Plaintiffs in the position of advocating for jurisdiction. However, Defendants fail to identify any case law supporting such a stance under similar circumstances.

Based on the Court's review, it appears that the issue of who carries the burden of proving application of the SIAA's exclusivity provision is an unaddressed issue. As such, the Court turns to how the Ninth Circuit has addressed an exception to a waiver of sovereign immunity in the SIAA's sister statute the Federal Tort Claims Act ("FTCA"). "The FTCA waives sovereign immunity from suits arising out of certain negligent acts of federal employees." *Chang v. United States*, 139 F.4th 1087, 1092 (9th Cir. 2025) (citation and internal quotation marks omitted). "The government's immunity is restored, however, under what is known as the 'discretionary function exception,' with respect to claims arising out of certain discretionary duties of federal agencies and employees." *Young v. United States*, 769 F.3d 1047, 1053 (9th Cir. 2014). "That exception disallows tort liability against the United States in the case of claims 'based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal

24-cv-00297-AJB-VET

agency or an employee of the Government, whether or not the discretion involved be abused.'" *Chang*, 139 F.4th at 1092–93 (quoting 28 U.S.C. § 2680(a)). "Because an exception to the FTCA's general waiver of immunity, although jurisdictional on its face, is analogous to an affirmative defense, [the Ninth Circuit joined] the Sixth and Seventh Circuits [in] correctly plac[ing] the burden on the United States as the party which benefits from the defense." *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992). For over three decades, the Ninth Circuit has held that the discretionary function exception applies equally to the SIAA as to the FTCA. *See Earles v. United States*, 935 F.2d 1028, 1032 (9th Cir. 1991); *see also Fiedler v. United States*, 165 F.4th 1310, 1316 (9th Cir. 2026) ("The government bears the burden of proving that the discretionary function exception [to the SIAA's waiver of immunity] applies.").

Because the exclusivity provision limits the SIAA's waiver of immunity by requiring applicable suits be brought only against the United States, rather than agents, the Court finds it to be, though jurisdictional, similarly analogous to an affirmative defense. As such, the Court holds that the party invoking protection of the SIAA's exclusivity clause bears the burden of proving it applies.[3]

### 2. Suits in Admiralty Act

The Court turns next to whether SIAA and, more specifically, its exclusivity provision apply to the instant action.

### i. Legal Framework

"[T]he SIAA applies when (1) a vessel is owned by the United States or operated on its behalf, and (2) there is a remedy cognizable in admiralty for the injury." *Ali v. Rogers*, 780 F.3d 1229, 1233 (9th Cir. 2015); *see also Dearborn v. Mar Ship Operations, Inc.*, 113

---

[3]    Interestingly, although the Court finds Defendants' reliance on original jurisdiction cases misplaced, the Ninth Circuit's analysis in one such cited case actually provides another analogue supporting the Court's conclusion. In *Savage*, the Ninth Circuit analyzed whether a school district was an agent of the state of Arizona entitled to sovereign immunity. *See generally Savage*, 343 F.3d 1036. There, the school district defendant—not the plaintiff—bore the burden of proving it was an agent of the state entitled to sovereign immunity. (*Id.*)

24-cv-00297-AJB-VET

F.3d 995, 996 n.1 (9th Cir. 1997) ("[T]he Suits in Admiralty Act does not itself provide a cause of action. It merely operates to waive the sovereign immunity of the United States in admiralty suits.") (citation and internal quotation marks omitted).

"The Constitution's grant of federal jurisdiction for admiralty, 'codified at 28 U.S.C. § 1333(1), allows the filing of claims related to maritime contracts and maritime torts.'" *Ali*, 780 F.3d at 1234–35 (quoting *In re Mission Bay Jet Sports, LLC,* 570 F.3d 1124, 1126 (9th Cir. 2009)). "Tort claims may sound in admiralty jurisdiction if they satisfy a test with three components showing that the claim has the requisite maritime flavor." *Id.* at 1235. "The relevant tort or harm must have (1) taken place on navigable water (or a vessel on navigable water having caused an injury on land), (2) 'a potentially disruptive impact on maritime commerce,' and (3) a 'substantial relationship to traditional maritime activity.'" *Id.* (quoting *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 534 (1995)).

The SIAA contains an exclusivity provision under which, "[i]f a remedy is provided by this chapter, it shall be exclusive of any other action arising out of the same subject matter against the officer, employee, or agent of the United States or the federally-owned corporation whose act or omission gave rise to the claim." 46 U.S.C. § 30904; *see also United States v. Sherwood*, 312 U.S. 584, 586 (1941) ("The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.").

### ii.    Application of SIAA Generally

Plaintiffs do not contest either that the BHR is a vessel owned by the United States or that there is a remedy cognizable in admiralty for their injuries. (*See generally* Doc. Nos. 34; 35.) *See also Ramirez v. Ghilotti Bros. Inc.*, 941 F. Supp. 2d 1197, 1210 n.7 (N.D. Cal. 2013) (collecting cases demonstrating that failure to respond to an issue concedes it). Regardless, based on its own analysis, the Court finds that Plaintiffs' negligence, trespass, and nuisance claims have the requisite maritime flavor, passing both the location prong and the nexus prongs to sound in admiralty. *See California Marine Cleaning, Inc. v. United*

*States through Dep't of the Navy*, 684 F. Supp. 3d 1014, 1020–21 (S.D. Cal. 2023) (finding the same with regard to a subcontractor's negligence claims). All three claims arise from a fire that occurred aboard the BHR while it was docked at the Naval Base and had a potentially disruptive impact on maritime commerce by spreading to nearby vessels or making the neighboring marinas inaccessible while the fire was being contained and extinguished for days. The "activity giving rise to the incident" was the allegedly negligent actions of Defendants while conducting repairs and providing fire safety services to the docked vessel, which are activities that show "a substantial relationship to traditional maritime activity." *See In re Mission Bay Jet Sports, LLC*, 570 F.3d at 1126. As such, Plaintiffs' claims fall within the scope of the SIAA.

### iii.   Application of the Exclusivity Provision Specifically

Thus, if Defendants—whose acts or omissions allegedly gave rise to Plaintiffs' claims—were acting as agents of the United States at the time of the Incident, then the SIAA's exclusivity provision would bar Plaintiffs' suit. It is this narrow issue of agency upon which the parties disagree, both on the substantive determination and on whether it is appropriate to make such a determination at this stage of litigation.

### a.   Rules of Agency

In determining whether agency exists for purposes of the SIAA, courts in the Ninth Circuit "use the common law definition of agency as a starting point for [their] analysis and will then consider the relevant case law as well as the specific provisions of the agreement between [the parties]." *Dearborn*, 113 F.3d at 997. "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) Of Agency § 1.01 (2006). "[A]n 'agent' [i]s one who is employed as a fiduciary, acting for a principal with the principal's consent and subject to the principal's overall control and direction in accomplishing some matter undertaken on the principal's behalf." *Dearborn*, 113 F.3d at 997 (citation and internal quotation marks omitted).

"Two characteristics appear most often to be dispositive" in cases finding agency under the SIAA: "(1) the United States must exercise significant control over the charterer's activities—either day to day control or overall control and direction of the mission, and (2) the charterer must be engaged in conducting the business of the United States." *Id.* at 997–98.[4] "In this respect, 'agent' may apply more broadly in this context than it does elsewhere, and may include in some cases entities properly defined as 'independent contractors.'" *Dearborn*, 113 F.3d at 998 n.3; *see also DeFiore*, 85 F.4th at 555 ("The common term 'independent contractor' is equivocal in meaning and confusing in usage because some termed independent contractors are agents while others are nonagent service providers.") (cleaned up).

### b.   Factual Dispute Over Agency

As briefly discussed *supra* § II.B.1, there is a factual dispute over the issue of agency.

NASSCO argues that the relationship between it and the United States was substantively one of agency because "the Navy comprehensively controlled NASSCO's work." (Doc. No. 31-1 at 22–23.) Specifically, NASSCO asserts (1) the Navy dictated what NASSCO was required to do and how to do it without permitting NASSCO to unilaterally act, (2) the Navy "reinforced its control through 'continuous' quality assurance monitoring," and (3) NASSCO's maintenance work filled a government need incident to the BHR's operation. (Doc. No. 31-1 at 18–22.) NASSCO supports its motion with the declaration of Jamie Van Cleaf, Director of Project and Materials Engineering for NASSCO, who was Program Manager "responsible for full execution of the repair work, quality, cost, schedule, and safety" of the BHR repairs. (Doc. No. 31-2 ("Van Cleaf Decl.").) Van Cleaf avers to his understanding of the Navy's control over NASSCO based on, *inter alia*, the contract, the Standard Items, the Navy Regulations, and the NAVSEA

---

[4]   "[A] charter party is a contract for the use (lease) of a vessel in whole or in part. . . . It is a specialized form of contract for the hire of a ship, specified by name. . . . The party that obtains the use and service of the ship is called the charterer or shipper; the party supplying the ship is the carrier or shipowner." Charter Party Forms and Functions, 2 Admiralty & Mar. Law § 11:1 (7th ed. 2026).

24-cv-00297-AJB-VET

8010 Manual, all or portions of which are attached as exhibits to the declaration. (*Id.*; *see also* Doc. No. 31-3 (NASSCO Contract).)

USSI joins NASSCO's motion, asserting the arguments apply equally. (Doc. No. 32.) Specifically, USSI asserted that it "was under contract with the US Navy to provide technical support services," the "scope of [which] clearly involved performance of services supportive of federal government missions." (Doc. No. 32 at 2.) Additionally, USSI states that the contract required the Navy, through the Southwest Regional Maintenance Center ("SWRMC"), to direct, oversee, supervise and control all work and assignments, while USSI was required to comply with SWRMC directives without discretion or authority to deviate from those directives, unilaterally act, or independently command other personnel. (*Id.* at 2–3.) In support of its motion, USSI proffers the declaration of its president, Micheal Fernandez (Doc. No. 32-1 ("Fernandez Decl.")) and its contract (Doc. No. 32-2).

In the FAC, Plaintiffs allege that "[b]oth companies[, NASSCO and USSI,] were hired as independent contractors, and not as agents of the United States government." (FAC ¶ 20; *see also id.* ¶¶ 19, 22, 25–26.) Relying on NASSCO's contract with the United States and the Command Report,[5] Plaintiffs point to six factors in the Restatement (Second) of Agency that support a finding that NASSCO was an independent contractor. (Doc. No. 34 at 19–22; FAC ¶¶ 19–22. 25–26.) Specifically, Plaintiffs argue (1) the contractual language demonstrates an intent to create a non-agent independent contractor relationship, (2) NASSCO agreed to furnish the materials and management to complete the work, except for those specifically identified by the United States, (3) NASSCO received profits, (4) the contracted period, including extensions, was limited, (5) NASSCO possessed specialized skills to conduct the repairs, and (6) the United States did not have actual control over NASSCO's everyday activities because NASSCO routinely acted on their own, without

---

[5]   Both NASSCO and GDC's motion and Plaintiffs' opposition attach the U.S. NAVY, COMMAND INVESTIGATION INTO THE FIRE ABOARD USS BONHOMME RICHARD (LHD-6) 12 JULY 2020, 5830 MEMO N00/156 (Apr. 5, 2021). (*See* Doc. Nos. 31-8 ("Command Report"); 34-1 at 146–579.) For clarity and efficiency, the Court eschews parallel citation to both filings. Instead, citation hereafter is to the Command Report filed at Doc. No. 31-8 with pincites to CM/ECF's electronic pagination.

24-cv-00297-AJB-VET

submitting for approval, and demonstrated actual ownership over Lower V. (Doc. No. 34 at 19–22.) Moreover, Plaintiffs argue that "Defendants' negligent and reckless actions as independent contractors fall outside the scope of the Contract with the Navy and, as a result, causes Defendants' actions to fall outside of the same subject matter as any perceived remedy against the United States." (*Id.* at 11.)

Similarly, Plaintiffs rely on USSI's contract with the United States and the Command report to argue USSI was an independent contractor not subject to the SIAA's exclusivity provision. (Doc. No. 35.) Specifically, Plaintiffs assert "USSI does not present sufficient facts for the Court to conclude it was, in fact, an agent of the United States" because its motion is supported by a self-serving declaration that is both conclusory and contradicted by the applicable contract. (*Id.* at 6–8.) Plaintiffs also incorporate their arguments from their opposition to NASSCO and GDC's motion into their opposition to USSI's motion as USSI joined the former's motion to dismiss. (*Id.* at 3.)

Having reviewed the briefs and all evidence attached thereto, the Court agrees with Plaintiffs that there is a genuine and extensive factual dispute. The NASSCO Contract expressly defines NASSCO "as an independent Contractor and not as an agent of the Government[.]" (Doc. No. 31-3 at 81.) Detailed requirements of both contracts and the incorporated standards indicate control. However, evidence of how those provisions and requirements were implemented on the vessel is necessary to assess whether actual control was exerted, particularly considering that Plaintiffs assert Defendants acted outside the scope of their contract.[6] The Command Report also includes conflicting reports on the issue. For example, some evidence indicates that the Navy did not exercise significant

---

[6] Defendants' argument in reply seems to imply that *Dearborn* sets forth an exclusive test for identifying when a charter is an agent. (*See* Doc. No. 36 at 5 (stating "Plaintiffs barely discuss the evidentiary record" in disregard of Plaintiffs' six factor analysis), 6 ("Plaintiffs offer no evidence to rebut any of these facts, nor do they explain how these facts are insufficient to meet the governing 'overall control and direction of the mission' test.").) However, *Dearborn* states that (1) the common law definition of agency is their "starting point" and (2) the factors proffered by Defendants as exclusive are the "[t]wo characteristics [that] appear most often to be dispositive[.]" *Dearborn*, 113 F.3d at 997–98. Nothing in *Dearborn* suggests that the inquiry is restricted to only those two factors.

24-cv-00297-AJB-VET

control over Defendants' day-to-day activities or that Defendants sometimes acted outside the scope of their contracts:

> According to the NASSCO PM[7] for [the BHR], when ship spaces were undergoing maintenance performed by NASSCO, the ship still used spaces in some circumstances. Space "ownership" would be transferred to the ship when all contractor work in a space had been completed. A housekeeping walkthrough would be conducted within the space, and full custody would then be turned over to the ship.

(Command Report at 94.)

> The [BHR] CO,[8] XO,[9] CMC,[10] and Department Heads did not effectively ensure the readiness and material condition of the spaces under their cognizance. Contributing to this, both the Lead Maintenance Activity (LMA) and several of the ship's Department Heads misunderstood [BHR]'s absolute responsibility and ownership over the material condition of the ship's spaces, regardless of the maintenance work being conducted. The LMA and [BHR] erroneously thought space ownership was transferred to the LMA for work and back to Ship's Force after completion within a space after formal turnover occurred. [BHR] leadership's lack of ownership and responsibility for the ship and its physical spaces throughout the phases of the availability directly led to the poor material condition in Lower V and Upper V on the morning of 12 July 2020, which hastened the spread of the fire and impeded efforts to attack it.

(*Id.* at 286.)

> The Deck Department Head and LCPO[11] failed to exercise control over the storage of materials in both Upper V and Lower V. Both individuals stated that NASSCO owned the spaces while acknowledging the ship stored large quantities of material in the space. They were not proactive in monitoring or preventing accumulation of combustible material.

(*Id.* at 287.)

///

---

7   Project Manager. (Command Report at 425.)
8   Commanding Officer. (*Id.* at 419.)
9   Executive Officer. (*Id.* at 427.)
10   Command Master Chief. (*Id.* at 342.)
11   Lead Chief Petty Officer. (*Id.* at 342.)

13

> USS Inc. manages the FSO[12] program for SWRMC. USS Inc. is contracted to assist "the GFSO[13] with Fire Safety Program development, implementation, inspection, and training in order to ensure safe industrial repair operations for U.S. Navy ships during maintenance availabilities under SWRMC's cognizance."

(*Id.* at 167.)

> SWRMC utilization of contractors from [USSI] to fill FSO responsibilities was executed without adequately addressing the limitations of contractors vice government employees. The inability to direct the prime contractor (a reserved government function) or formally vote as Chairman of the FSC[14] are key examples of such limitations. As a member of the [Project Team], their status as a contractor was further subjected to the direction of the PM or other government employees, making it unlikely they could effectively act as arbiters of risk decisions. This further contributed to fire risk accumulation on BHR.

(*Id.* at 296.)

> SWRMC failed to adequately oversee the USS[I] CFSOs.[15] There was an example of a forged FSO letter of designation for the duties with regard to specific ships, and unqualified individuals conducted FSO qualification boards.

(*Id.*)

On the other hand, the Command Report also includes broad statements of the Navy's "absolute responsibility for the safety, well-being and efficiency of the ship," (*id.* at 283), the CO's "absolute responsibility for the safety of his or her command as well as 'overall control of the shipboard emergency response," (*id.* at 195), and the Navy's "absolute responsibility and ownership over the material condition of the ship's spaces, regardless of the maintenance work being conducted," (*id.* at 286). (*See also* Van Cleaf Decl. ¶ 16; Doc. No. 36 at 8.) Such statements are corroborated by Defendants' declarations. Van Cleaf attests to the instructions and specifications the Navy provided

---

[12] Fire Safety Officer. (*Id.* at 410.)
[13] Government Fire Safety Officer. (*Id.* at 422.)
[14] Fire Safety Council. (*Id.* at 421.)
[15] Contract Fire Safety Officers. (*Id.* at 63.)

24-cv-00297-AJB-VET

about how NASSCO was to complete work, the Navy's verification and approval process for completed work, and the "exclusive control" the Navy exercised "as dictated by Navy policies and regulations over NASSCO's day-to-day ability to access the Vessel and, once on board, specific areas of the Vessel to perform its work under the Contract." (Van Cleaf Decl. ¶¶ 10–12, 15.) Fernandez avers that the Navy through SWRMC "directed, oversaw, supervised, and controlled" "every significant aspect" of USSI's performance under the contract, including "USSI's fire safety support activities on the [BHR] at all times prior to the Incident," while USSI had no discretion or authority. (Fernandez Decl. ¶ 6.)

Because the application of the exclusivity provision turns on the disputed factual issue of agency, the Court must next determine whether this issue is intertwined with the merits of Plaintiffs' claims. Plaintiffs assert that resolution of the factual dispute is improper at this stage of the proceedings because "question of jurisdiction is 'so intertwined' with resolution of the factual issues going to the merits of the case." (Doc. No. 34 at 8–10.) NASSCO and GDC counter that there is no intertwinement because (1) the SIAA provides the basis for jurisdiction but not Plaintiffs' claim for relief and (2) the issue of agency—the jurisdictional issue—is not an element of negligence—the merits issue. (Doc. No. 36 at 4–5.)

"[W]here the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). The Ninth Circuit has concluded "jurisdictional issues are intertwined with an element of the merits of the plaintiff's claim" where (1) "a party's right to recovery rests upon the interpretation of a federal statute that provides both the basis for the court's subject matter jurisdiction and the plaintiff's claim for relief," (2) "the claim at issue arises under the Constitution," (3) "in the context of a motion to remand to state court a case involving federal-officer removal jurisdiction," the disputed fact is "material to federal-officer jurisdiction" and "intertwined with an element of the plaintiff's claim," and (4) "a

24-cv-00297-AJB-VET

plaintiff's allegations concerning standing are intertwined with allegations concerning an element of her claim." *Bowen*, 118 F.4th at 1143 (citations omitted).

As an initial matter, both of Defendants' arguments are correct. First, "[t]he SIAA provides no cause of action; it just waives sovereign immunity where an admiralty remedy is available." *Ali*, 780 F.3d at 1233. Second, agency is not an element of negligence. *Cf. Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1070 (9th Cir. 2001) ("[T]o recover for negligence, a plaintiff must establish: (1) duty; (2) breach; (3) causation; and (4) damages.").

However, resolution of the factual issues necessary to determine agency—specifically the actual on-the-boat circumstances of Defendants' day-to-day experience and performance—are the same factual issues that will likely be proffered to demonstrate breach or a lack of breach of Defendants' alleged duty. Because these factual issues within the Command Report, contracts, and declarations will be proffered as evidence for the merits of Plaintiffs' claims, it would be inappropriate for the Court on the limited record before it to resolve those factual issues for the purpose of resolving whether the SIAA's exclusivity provision applies. *See, e.g.*, *Daniels v. United States*, No. 316CV02077BTMDHB, 2017 WL 3478765, at *7 (S.D. Cal. Aug. 11, 2017) ("[T]he Court believes the agency issue is more appropriately resolved on a motion for summary judgment after limited discovery.").

NASSCO argues that "the long line of cases . . . cited in its motion . . . find SIAA agency on facts like those here." (Doc. No. 36 at 6.) However, the Court finds NASSCO's cases unpersuasive. Two of the cases NASSCO relies upon address the issue of agency on summary judgment, which is procedurally inapposite to this action's current posture.[16] *See Dearborn v. Mar Ship Operations, Inc.*, 113 F.3d 995 (9th Cir. 1997); *Favorite v. Marine Pers. & Provisioning, Inc.*, 955 F.2d 382 (5th Cir. 1992). Cases addressing the issue on a

---

[16]     Moreover, to a degree, these cases align with the Court's impression that the agency issue here is too underdeveloped and would be more appropriate after completion of discovery and on, for example, summary judgment.

24-cv-00297-AJB-VET

motion to dismiss involved complaints in which the plaintiffs pled an agency relationship. *See Daniels*, 2017 WL 3478765, at *7 ("Whether this allegation [that the defendants were 'agents and/or subagents'] is the result of error or not, Plaintiff and this Court are bound by it, and as Defendants SA-TECH and CPC are (at least for this Court's immediate consideration) agents of the United States under the SIAA, their joint motion must be granted."). *Also compare Compton v. Oasis Sys., LLC*, 549 F. Supp. 3d 1173 (S.D. Cal. 2021), Def.'s Mot. Dismiss, Doc. No. 3-1 at 16–17 ("Plaintiff has not sued the United States in this action. To the extent Plaintiff may claim that the United States is one of the Doe defendants, the allegations in the Complaint that Defendants at all times acted in the scope of 'their agency' is dispositive.") *with generally* Pl.'s Opp'n, Doc. No. 6 (not contesting agency).

Finally, the scope of the contracts at issue was much narrower than those of the charterers in many of the cases cited by Defendants. *See, e.g.*, *Dearborn*, 113 F.3d at 996 ("Dearborn, a seaman employed by Bay Ship as a wiper aboard the United States Naval Ship KANE, was injured when he slipped and fell down a stairway that led from the deck of the vessel into the engine room. At the time of the injury, the KANE was owned by the United States through the United States Navy, Military Sealift Command, but chartered to Bay Ship under the terms of an agreement entitled 'Performance Work Statement–Military Sealift Command–Special Mission Oceanographic and Hydrographic Survey Ships.'"); *Smith v. United States*, 346 F.2d 449 (4th Cir. 1965) ("The Potomac, a Navy tanker owned by the United States, was a public vessel. Employed exclusively in hauling petroleum products to various military bases for national defense, she was under the direction and control of the Military Sea Transportation Service (MSTS). Subject to the other provisions of the contract with the Government, which was dated June 22, 1961, Marine undertook to 'manage and conduct the business regarding the operation of such tankers', including the Potomac, 'as may be furnished to it by the Government from time to time.'"); *Petition of U.S.*, 367 F.2d 505, 507–08 (3d Cir. 1966) ("Briefly, Mission San Francisco was an undocumented tanker owned by the United States. At the time of the collision, this tanker

24-cv-00297-AJB-VET

was being operated by Mathiasen under a contract with Military Sea Transportation Service, an agency of the United States Navy. The agreement provided that Mathiasen would 'manage and conduct the business of the Government with respect to' the tanker and, to that end, would 'equip, fuel, supply, maintain, man, victual, and navigate' the ship. Mathiasen supplied a master and a civilian crew. There is no suggestion that under this contract the tanker could be or ever was used except in 'the business of the Government', more particularly as a naval supply ship."); *Favorite*, 955 F.2d at 384 ("The USNS SEALIFT CARIBBEAN is owned by Marine Vessel Leasing Corporation (Leasing) and bareboat chartered to the United States, via the Military Sealift Command (MSC). The MSC entered into a contract with Marine Personnel and Provisioning, Inc. (Personnel) and Marine Transport Management Company (Management) to provide the maintenance, operations and crew for the USNS SEALIFT CARIBBEAN."). The level of control the *Dearborn* factors set forth as often dispositive demonstrate significant oversight when the scope of the charter party covers the entirety of a vessel; however, that level of control is much more routine when the scope of the applicable contract is for more narrow services. As such, the Court is not persuaded at this early stage of litigation by Defendants' reliance on these cases for blanket comparison of the level of control necessary where the entities at issue were not charterers.

Having found the factual determinations required to resolve application of the SIAA exclusively provision and the merits of Plaintiffs claim are intertwined, the Court **DENIES without prejudice** Defendants' motion to dismiss pursuant to Rule 12(b)(1). *See Augustine*, 704 F.2d at 1077 ("[T]he jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial."). Defendants may reraise the issue of jurisdiction after discovery. *See, e.g.*, *Shaw v. United States*, No. 18-CV-06243-PJH, 2019 WL 268648, at *3 (N.D. Cal. Jan. 18, 2019) ("An early summary judgment motion—or another challenge to this court's subject matter jurisdiction—may be appropriate following discovery on the issue of agency."); *Daniels*, 2017 WL 3478765, at *7.

24-cv-00297-AJB-VET

## IV.   MOTIONS TO DISMISS PURSUANT TO RULES 8 AND 12(b)(6)

Defendants seek to dismiss the claims against GDC for failure to state a claim because the factual allegations expressly naming GDC are independently insufficient and the allegations referring to Defendants collectively violate Rule 8. (Doc. Nos. 31-1; 32.) USSI's motion expands the scope of the Rule 8 challenge to seek dismissal of the entire action "due to Plaintiffs' impermissible group pleading." (Doc. No. 32 at 4–5.)

### A.   Legal Standard

Under Rule 8(a)(2) a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "A Rule 12(b)(6) motion tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "The court may dismiss a complaint as a matter of law for (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim." *SmileCare Dental Grp. v. Delta Dental Plan of California, Inc.*, 88 F.3d 780, 783 (9th Cir. 1996) (citation and internal quotation marks omitted). To defeat a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"In deciding such a motion, all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them." *Navarro*, 250 F.3d at 732; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). Notwithstanding this deference, the reviewing court need not accept legal conclusions as true. *Iqbal*, 556 U.S. at 678. However, "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations and citation omitted).

24-cv-00297-AJB-VET

**B.    Discussion**

With regard to NASSCO[17] and USSI, the FAC proffers sufficient individualized allegations delineating both parties' responsibilities and failures related thereto. (*See, e.g.*, FAC ¶¶ 25 ("[NASSCO] was found to have had deviations within the requirements of both reasonable acceptable standards in the industry and the terms of its contract in storing and maintaining its supplies on board the [BHR]. During its time performing its duties as independent contractor, [NASSCO] remained in custody and control of portions of the [BHR] rather than the ship being in the custody and control of the United States government."), 26 ("[USSI] was an independent contractor hired by the United States to provide fire safety services. Upon information and belief, [USSI] did not have the proper certifications to provide these services to the United States while performing its contracted work on the [BHR]. In addition, [USSI] failed to adequalty [sic] warn the military personnel on the [BHR] about potential fire hazards—including the fire hazards that led rise to the fires on July 12, 2020—nor did [USSI] notify any other Defendants that they were out of compliance with reasonable fire safety protocols.").)

Because Plaintiffs allege in essence that NASSCO was responsible for safely storing and maintaining its supplies in the areas it was working on and USSI was responsible for fire safety of the entire ship, collective allegations regarding, for example, failure to properly "avoid[] clutter, follow[] fire safety measures, enable[] unrestricted access to firefighting and damage control equipment," and "maintain[] close watch on the area" are reasonably attributable to both NASSCO and USSI. (*See* FAC ¶¶ 27, 29; *see, e.g.*, *id.* ¶¶ 28 ("Defendants had carelessly placed large and heavy electric and other cables in a manner that prevented sailors from closing doors and other hatches to prevent the further spread of

---

[17]    NASSCO's Rule 8 challenge is surgically crafted to target the collective allegations only to the extent Plaintiffs intended to include GDC. (*See* Doc. No. 31-1 at 26–27.) However, USSI's joinder either misreads NASSCO's narrow argument or intentionally expands it to challenge the collective pleading of all Defendants as a violation of Rule 8. (*See* Doc. No. 32 at 4–5.) Although USSI cannot challenge allegations on NASSCO's behalf, the Court addresses whether Rule 8 is violated as to any Defendant for completeness.

24-cv-00297-AJB-VET

the fire. Misplaced scaffolding, equipment, and debris also came in the way of firefighters, thereby compounding the already difficult task of fighting flames."), 43 ("Defendants each have special knowledge and expertise far beyond that of a layperson with regard to the ship safety and ship fire mitigation, engineering, construction, use, operation, inspection, repair, and maintenance of US Navy warships."), 44 ("Defendants had a duty to Plaintiffs to take reasonable steps to prevent ship fires, fight ship fires, control ship fires and mitigate fire hazards aboard the vessel."), 45 ("Defendants breached the above duties by failing to take reasonable steps to mitigate fire hazards, prevent fires, and fight ship fires.").)

Accordingly, the Court finds that the FAC does not violate Rule 8 as to NASSCO and USSI by including collective allegations. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1184 (9th Cir. 2016) ("There is no flaw in a pleading, however, where collective allegations are used to describe the actions of multiple defendants who are alleged to have engaged in precisely the same conduct.").

Turning to GDC, the FAC makes only two allegations against GDC by name:

> Defendant GENERAL DYNAMICS CORPORATION, INC., was, at all times relevant to this pleading, a Delaware corporation authorized to do, and doing business, in California. At all times relevant to this pleading, GENERAL DYNAMICS CORPORATION, INC., provided services supporting the USS Bonhomme Richard and did so through its agents, employees, and subsidiaries, including by working in concert by and through NATIONAL STEEL AND SHIPBUILDING COMPANY.

(FAC ¶ 15.)

> "Upon information and belief, at all times relevant to this complaint, NATIONAL STEEL AND SHIPBUILDING COMPANY is and was a subsidiary of GENERAL DYNAMICS CORPORATION, INC. and worked with and reported to GENERAL DYNAMICS CORPORATION, INC."

(FAC ¶ 21.)

Plaintiffs assert that, accepting these allegations as true, they "have pleaded GDC dictates general policies and controls how NASSCO will operate on a day-to-day basis." (Doc. No. 34 at 26.) To the extent Plaintiffs seek to hold GDC directly liable for its own actions, these allegations are insufficient. Unlike the allegations against NASSCO and

24-cv-00297-AJB-VET

USSI which include detailed acts and omissions prior to the collective pleading, the allegations against GDC fail to provide a sufficient basis for how they were directly involved such that the collective pleading makes sense. To the extent Plaintiffs seek to hold GDC liable on a theory of alter ego, the FAC is devoid of allegations supporting such a theory. (*See generally* FAC; *see also* Doc. No. 31-1 at 24–26 (raising and disposing of an alter ego theory).) In fact, from Plaintiffs' opposition, it appears Plaintiffs had no intention of pleading alter ego against GDC as they devote multiple paragraphs to explaining why "*Defendants'* argument that GDC is only an alter ego must fail."[18] (Doc. No. 34 at 25–26.) With regard to GDC only, the FAC violates Rule 8 and fails to state a claim pursuant to Rule 12(b)(6).

Plaintiffs request leave to amend the FAC (Doc. No. 34 at 27), while NASSCO asserts that such amendment would be futile because (1) Plaintiffs do not identify what allegations they would add and (2) Plaintiffs "have already amended once without substantively changing it" (Doc. No. 36 at 11). Pursuant to Rule 15, "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) ("Absent prejudice, or a strong showing of any of the remaining *Foman* factors, there exists a presumption under Rule 15(a) in favor of granting leave to amend."). Here, Defendants do not assert Plaintiffs' request is infected by bad faith or dilatory motive or would inflict undue prejudice. *Cf. Foman v. Davis*, 371 U.S. 178, 182 (1962). Although Plaintiffs amended their initial complaint in response to Defendants' initial motion to dismiss, the amendment successfully addressed some issues raised by Defendants and shifted the landscape of Defendants' subsequent motions to dismiss. This is not yet a circumstance where Plaintiffs have taken multiple "bites at the apple by alleging and re-alleging the same theories in an attempt to cure pre-existing deficiencies." *See Eminence Cap.*, 316 F.3d at 1053 (citation and internal quotation marks omitted). The Court finds providing leave to amend proper at this juncture.

---

[18]    Despite this, Plaintiffs conclude they should be entitled to conduct discovery into application of California's alter ego factors based on the allegations within the FAC (Doc. No. 34 at 28 n.8).

24-cv-00297-AJB-VET

*See Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004) ("Dismissal without leave to amend is improper unless it is clear . . . that the complaint could not be saved by any amendment.").

### C. Conclusion

Accordingly, the Court **GRANTS** NASSCO and GDC's motion to dismiss claims against GDC for failure to state a claim. However, the Court **GRANTS in part** and **DENIES in part** USSI's motion to dismiss. All claims against GDC are **DISMISSED with leave to amend** pursuant to Rules 8 and 12(b)(6). The Court **GRANTS** Plaintiffs leave to amend the FAC for the **limited purpose** of addressing the deficiencies regarding GDC identified herein. Amendment beyond the scope provided will not be considered.

## IV. CONCLUSION

Based on the foregoing, the Court hereby **ORDERS**:

1. Defendants' motions to dismiss pursuant to Rule 12(b)(1) are **DENIED without prejudice**.

2. NASSCO and GDC's motion to dismiss claims against GDC pursuant to Rules 8 and 12(b)(6) is **GRANTED**. All claims against GDC are **DISMISSED**.

3. USSI's motion to dismiss all claims pursuant to Rules 8 and 12(b)(6) is **GRANTED in part** and **DENIED in part** as detailed *supra*.

4. Plaintiffs are **GRANTED limited leave to amend** the claims against GDC only as detailed *supra*.

5. If Plaintiffs choose to file an amended complaint, it must comply with the limited leave granted herein and be filed **no later than <u>April 13, 2026</u>**. Plaintiffs must concurrently file a red-lined version of the amended complaint in compliance with Civil Local Rule 15.1.c.

///

///

///

///

24-cv-00297-AJB-VET

6.      Defendants must file a responsive pleading to the operative complaint no later than **April 27, 2026**. If Defendants wish to respond to any amended complaint pursuant to Rule 12, such a motion must be limited to addressing only that which Plaintiffs substantively amended.

**IT IS SO ORDERED**.

Dated:  March 30, 2026

Hon. Anthony J. Battaglia
United States District Judge

24-cv-00297-AJB-VET